UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IHI E&C INTERNATIONAL
CORPORATION *et al.*,

     Plaintiffs,

v.

ROBINSON MECHANICAL
CONTRACTORS, INC., d/b/a
ROBINSON CONSTRUCTION
COMPANY *et al.*,

     Defendants.

CIVIL ACTION NO.
1:19-cv-04137-JPB

## **ORDER**

Before the Court are Defendant Fidelity and Deposit Company of

Maryland's ("Fidelity") Motion for Partial Summary Judgment, ECF No. 163, and

Plaintiff IHI E&C International Corporation's ("IHI") Cross Motion for Summary

Judgment, ECF No. 179.[1]  Having fully considered the parties' initial and post

hearing briefs and their arguments at the hearing on the motions, the Court finds as

follows:

---

[1] Defendant Robinson Mechanical Contractors, Inc. supports Fidelity's position
and filed briefs in support of Fidelity's motion and in opposition to IHI's motion.
For ease of reference and because Fidelity's and Robinson's arguments are similar,
the Court will refer to Fidelity's and Robinson's arguments as Fidelity's
arguments.

I.   **BACKGROUND**

In September 2019, IHI filed suit against Robinson Mechanical Contractors, Inc. ("Robinson") and Fidelity alleging several causes of action in connection with a complex construction project in Elba Island, Georgia (the "Project").  Fidelity now moves the Court for a ruling that a bond Fidelity issued to secure Robinson's performance on its construction contract with IHI does not cover two other agreements between IHI and Robinson.  IHI seeks the opposite judgment, *i.e.*, that the performance bond covers the construction contract as well as the two other agreements.  The following relevant facts are not in dispute.

Robinson entered into three separate written agreements with IHI that are the subject of IHI's Complaint.  Under the first agreement, which was signed on June 6, 2016, Robinson agreed to furnish certain pipes and rack modules for the Project at the price of $35,560,649.54 ("Purchase Order No. 1").  IHI did not require Robinson to furnish a performance bond for Purchase Order No. 1.  Instead, IHI required Robinson to provide an irrevocable letter of credit.  That letter of credit has expired.

Robinson and IHI entered into a second written agreement signed on February 2, 2017, pursuant to which Robinson agreed to furnish certain process modules, piping, heat trace and pipe insulation for the Project at the price of

$5,143,648 ("Purchase Order No. 2").  IHI similarly did not require Robinson to provide a performance bond for Purchase Order No. 2.  IHI also did not require a letter of credit or any other security for Purchase Order No. 2.

Robinson and IHI entered into a third agreement, which Robinson signed on November 6, 2017, and IHI signed on November 14, 2017 (the "Construction Contract").  Under the Construction Contract, Robinson agreed to perform construction work at the Project site, including certain pipe rack and process module installation, for the price of $24,007,045.  During negotiations of the Construction Contract, IHI never mentioned that the Purchase Orders were related to the Construction Contract.  However, the parties executed a change order for one of the Purchase Orders that removed certain work from the scope of the Purchase Order and included it in the scope of the Construction Contract.

IHI required Robinson to obtain payment and performance surety bonds for the Construction Contract, each in the sum of $24,007,045—the value of the Construction Contract.  Robinson obtained the bonds from Fidelity, in its capacity as surety.  The performance bond, which was issued at a face value of $24,007,045 (the "Performance Bond"), extended coverage for only the "performance of the Construction Contract."  Specifically, Section 9 of the Performance Bond provides that:

> The surety shall not be liable to [IHI] or others for obligations of [Robinson] that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations.

Robinson's president testified that in his thirty-four years of experience obtaining and providing surety bonds for construction contracts, all of the bonds he has obtained have covered only the contract identified in the bonds and were issued at the face value of the bonded contract price.

In the construction industry, it is standard for payment and performance surety bonds to have the same penal sum as the bonded contract price. If the cost of the bonded work were significantly greater than the penal sum, the surety's risk would exceed the face value of the bond. For example, if a contract required work costing $24 million, the surety's risk on a $24 million bond would be negligible after $24 million worth of work was completed properly. If, however, the contract required work costing $64 million but the bond penal sum were only $24 million, the surety would still face full penal-sum risk long after the first $24 million in work was completed. For this reason, sureties expect and require that the estimated cost of the bonded work will be no more than the price of the bonded contract (and the penal sum of the bond).

It appears Robinson undertook work pursuant to the three agreements between 2016 and 2018. A significant portion of the work under the Purchase

Orders was performed away from the Project site, and the stated scope of the Purchase Orders did not include work at the Project site. Conversely, almost all of the scope of work under the Construction Contract was to be performed at the Project site. This work included the installation of certain components Robinson furnished under the Purchase Orders.

Robinson departed the Project site before the completion of the Project, and IHI retained replacement subcontractors to complete Robinson's work. IHI alleges that it discovered and was required to pay for extensive repairs and correction of defects on the work Robinson completed.

On July 24, 2019, IHI issued a demand to Robinson and Fidelity for payment in the amount of $31,180,565.

IHI contends that Robinson's work under the Purchase Orders was incorporated into the Construction Contract and is therefore covered by the Performance Bond. IHI's argument is based on an indemnity provision in section 30.3 of the Construction Contract ("Section 30.3"). Fidelity responds that the Purchase Orders are separate agreements that were not incorporated into the Construction Contract. Fidelity therefore concludes that the Performance Bond does not cover any work Robinson completed pursuant to the Purchase Orders. Thus, the question presented to the Court is whether the Construction Contract and

Performance Bond cover damages arising out of Robinson's work under the Purchase Orders.

## II.   **DISCUSSION**

### A.   **Legal Standard**

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56) (quotation marks omitted).  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court … is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Allen*, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the

movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.*

After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts indicating summary judgment is improper because a material issue of fact does exist. *Id.* In carrying this burden, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

In sum, if the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B.    Analysis

It is axiomatic that a federal court exercising diversity jurisdiction must apply the substantive law of the state where it sits. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525, 535 (1958) ("It was decided in *Erie [R.R.] Co. v. Tompkins* that the federal courts in diversity cases must respect the definition of state-created rights and obligations

7

by the state courts.") (italics added).  The parties agree that Georgia law applies

here, as designated in their agreements.[2]

Georgia law is clear that "construction [of a contract] is a matter of law for

the court."  *Envision Printing, LLC v. Evans*, 786 S.E.2d 250, 252 (Ga. Ct. App.

2016); *see also Gans v. Ga. Fed. Sav. & Loan Ass'n*, 347 S.E.2d 615, 618 (Ga. Ct.

App. 1986) ("It is ordinarily the duty of the court to interpret a contract as a matter

of law.").  Construction of a contract requires three steps:

> First, the trial court must decide whether the language is clear and
> unambiguous.  If it is, no construction is required, and the court
> simply enforces the contract according to its clear terms.  Next, if the
> contract is ambiguous in some respect, the court must apply the rules
> of contract construction to resolve the ambiguity.  Finally, if the
> ambiguity remains after applying the rules of construction, the issue
> of what the ambiguous language means and what the parties intended
> must be resolved by a jury.

*Envision Printing*, 786 S.E.2d at 252 (quoting *Gen. Steel v. Delta Bldg. Sys.*,

676 S.E.2d 451, 453 (Ga. Ct. App. 2009)).

The Court will follow these steps to determine the meaning of the language

in Section 30.3 and whether, as IHI contends, Robinson's work under the Purchase

---

[2] Under Georgia law, parties are free to stipulate what law should govern their
contracts, and courts will enforce a contractual choice of law clause that is not
contrary to public policy.  *See CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp.*,
642 S.E.2d 393, 396 (Ga. Ct. App. 2007).

Orders was incorporated into the Construction Contract and is therefore covered by the Performance Bond.

### 1.      Whether the Language in Section 30.3 is Clear and Unambiguous

"The court [initially] looks to the four corners of [an] agreement to ascertain the meaning of the contract from the language employed." *Brogdon v. Pro Futures Bridge Cap. Fund, L.P.*, 580 S.E.2d 303, 306 (Ga. Ct. App. 2003).  In that analysis, "[w]ords generally [are ascribed] their usual and common signification." O.C.G.A. § 13-2-2(2).  "[W]here the language of [the] contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the trial court." *Ainsworth v. Perreault*, 563 S.E.2d 135, 140–41 (Ga. Ct. App. 2002); *see also Triple Eagle Assocs., Inc. v. PBK, Inc.*, 704 S.E.2d 189, 195–96 (Ga. Ct. App. 2010) (stating that "where the terms of a written contract are plain and unambiguous, a court must confine itself to the four corners of the document to ascertain the parties' intent, and is not permitted to strain the construction of a contract, so as to discover an ambiguity") (internal punctuation omitted).

"Ambiguity exists where the words used in the contract leave the intent of the parties in question—i.e., that intent is uncertain, unclear, or is open to various interpretations." *Gen. Steel*, 676 S.E.2d at 453; *see also ESI Cos., Inc. v. Fulton*

9

*Cnty.*, 609 S.E.2d 126, 129 (Ga. Ct. App. 2004) ("Ambiguity in a contract may be defined as duplicity, indistinctness, and uncertainty of meaning or expression."). But a party's erroneous interpretation of the contract does not create ambiguity within it. *See generally*, *Mullis v. Bibb Cnty.*, 669 S.E.2d 716, 718 (Ga. Ct. App. 2008).

Here, Section 30.3 of the Construction Contract states as follows:

> [Robinson] shall, TO THE FULLEST EXTENT PERMITTED BY LAW, unconditionally indemnify, hold harmless, protect and defend [IHI] . . . from and against any damages, claims, demands, suits by any person or persons, losses, liabilities and expenses (including but not limited to, reasonable attorneys' fees, other litigation or arbitration costs and punitive damages, if allowed by applicable law), arising out of or resulting from Subcontractor's actions and/or omissions in the performance of the Work, the performance of other activities or services of any kind undertaken by [Robinson] or occurring in connection therewith (including [Robinson's] failure to comply with the terms of [the Construction Contract]), whether occurring on or off the Project site.

IHI and Fidelity disagree on whether the phrase "the performance of other activities or services of any kind undertaken by [Robinson] or occurring in connection therewith" means that Robinson agreed to indemnify IHI for alleged damages arising out of Robinson's fulfillment of the Purchase Orders. IHI contends that this phrase covers all of Robinson's activities undertaken for the Project, whether under the Purchase Orders or under the Construction Contract,

because the language is not limited to work completed under the Construction Contract.

In IHI's view, Section 30.3 covers damages arising out of the following *three* circumstances:  (i) "the performance of the [w]ork" outlined in the Construction Contract; (ii) "the performance of other activities or services of any kind undertaken by [Robinson]"; and (iii) activities "occurring in connection [with Robinson's work,] . . . whether occurring on or off the Project site."  IHI asserts that this is the only reasonable interpretation of Section 30.3 based on the plain language of the provision and its grammatical structure, *i.e.*, where the commas are placed in Section 30.3.

Fidelity rejects IHI's interpretation of Section 30.3 as unreasonable.  In particular, Fidelity contends that Section 30.3 should not be "construed so broadly as to bootstrap . . . independent and vastly larger obligations and liabilities disconnected in time and nature from" the Construction Contract.  Fidelity further argues that IHI's interpretation of the provision would not only incorporate work completed pursuant to the separate Purchase Orders, but it would also render Robinson and Fidelity liable for anyone's performance of any activities of any kind (whether on or off the Project site) and for any reason.

In Fidelity's view, Section 30.3 covers damages arising out of the following *two* circumstances:  (i) "the performance of the [w]ork" outlined in the Construction Contract; and (ii) "the performance of other activities or services of any kind undertaken by [Robinson] or occurring in connection [with Robinson's work,] . . . whether occurring on or off the Project site."  Fidelity maintains that the appearance of the word "performance" twice in parallel structure in Section 30.3 indicates that there are only two categories of performance for which indemnification was intended.  Fidelity further asserts that the phrase "in connection therewith" does not establish a separate obligation and instead modifies both the work Robinson undertook to fulfill under the Construction Contract and those activities occurring in connection with such work.

As evidenced by the foregoing discussion, the language used in Section 30.3 is subject to various interpretations and leaves the intent of the parties in question. The Court therefore finds that the language is ambiguous.

A jury question, however, does not automatically arise from such ambiguity. *See Envision Printing*, 786 S.E.2d at 252.  Instead, the Court must employ applicable rules of contract construction to resolve the ambiguity.  *Id.*

### 2. Applying the Rules of Contract Construction to Resolve the Ambiguity

"The cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3; *see also Nebo Ventures, LLC v. NovaPro Risk Sols., L.P.*, 752 S.E.2d 18, 26 (Ga. Ct. App. 2013) ("Enforcement of the parties' intent is superior to the other rules of construction."); *Young v. Stump*, 669 S.E.2d 148, 150 (Ga. Ct. App. 2008) (rejecting a construction of the contract that would not give effect to the parties' intent).

"'[A]fter the application of pertinent rules of contract construction . . . , extrinsic evidence becomes admissible to explain any remaining ambiguity.'" *Empire Distributors, Inc. v. George L. Smith II Georgia World Cong. Ctr. Auth.*, 509 S.E.2d 650, 653 (Ga. Ct. App. 1998); *see also Gans*, 347 S.E.2d at 618 (stating that extrinsic evidence is admissible to establish the parties' understanding of the terms of the contract at the time of its execution). Likewise, parol evidence "as to the surrounding circumstances is admissible to explain ambiguities and to aid in the construction of contracts." *Coleman v. Arrington Auto Sales & Rentals*, 669 S.E.2d 414, 416 (Ga. Ct. App. 2008); *see also Christian v. Christian*, 794 S.E.2d 51, 55 (Ga. 2016) (explaining that the trial court "should have looked beyond [the disputed paragraph] to determine if the ambiguity [in the agreement] was clarified

when viewed in the context of the entire [a]greement, and if not, should have considered parol evidence to determine the meaning of [the disputed paragraph]").

As relevant here, the Court will employ the following rules of construction to resolve the ambiguity in Section 30.3:  (i) the disputed language must be read in light of the contract as a whole and within the context in which the contract was created; (ii) an ambiguity in a contract should be construed against the drafter of the contract; (iii) a surety's obligations must be strictly and narrowly construed; and (iv) a universally practiced industry custom is binding.  However, the Court's analysis is bounded by the overarching requirement to discern the parties' intent and construe the agreement accordingly.

     **a.**       **Interpreting the Disputed Language in the Context of the Whole Contract and in Light of the Circumstances in Which the Contract Was Created**

Under O.C.G.A. § 13-2-2(4), "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part."  Therefore, courts analyze all the provisions of a contract together (not merely isolated clauses) and interpret them both to give the greatest effect possible to all provisions and to avoid rendering any of the provisions meaningless.  *See, e.g.*, *Langley v. MP Spring Lake, LLC*, 834 S.E.2d 800, 804 (Ga. 2019) (stating that a contract

provision must be read "in light of the contract as a whole and in the legal context in which it was created"). The underlying principle is that the contract must be read "reasonably" and "in a way that does not lead to an absurd result." *Office Depot, Inc. v. Dist. at Howell Mill, LLC*, 710 S.E.2d 685, 689 (Ga. Ct. App. 2011).

In this case, Section 30.3 is contained in the Construction Contract, and the Construction Contract is incorporated into the Performance Bond. Therefore, Section 30.3 must be read in light of the Construction Contract as a whole and the terms of the Performance Bond. The Construction Contract and the Performance Bond must also be viewed within the factual and legal contexts in which they were created.

To that end, it is undisputed that the Construction Contract's scope of work does not mention or incorporate the Purchase Orders. Instead, it lists discrete tasks that Robinson must complete.[3] The decision not to include or incorporate the Purchase Orders in the Construction Contract's scope of work is evidence that the parties did not intend to integrate the Purchase Orders' scope of work into the

---

[3] IHI identifies certain tasks in the Construction Contract that it argues indicate that the Construction Contract was intended to incorporate the work under the Purchase Orders. But even assuming those tasks related to the Purchase Orders, it does not follow that the inclusion of those tasks on the list of contemplated work demonstrates the parties' intent to incorporate the Purchase Orders, themselves, into the Construction Contract, along with all of the obligations arising under the Purchase Orders.

Construction Contract.  In fact, the parties executed a change order that removed limited tasks from the scope of a Purchase Order and included those tasks in the Construction Contract's scope of work.  They could have inserted the entirety of the Purchase Orders into the scope of the Construction Contract if they so desired. It is telling that they did not.

The surrounding circumstances of the Construction Contract's execution similarly support the conclusion that the Purchase Orders were independent agreements that were not incorporated into the Construction Contract.[4]  The record shows that the Purchase Orders were separately executed and had their own defined scope of work, which generally consisted of the fabrication of materials for use at the Project site.  The work under the Purchase Orders was primarily accomplished offsite and was largely complete by the time the parties executed the Construction Contract.

On the other hand, the scope of the Construction Contract primarily consisted of construction installation work at the Project site.  During negotiations of the Construction Contract, IHI never mentioned that the Purchase Orders were

_____

[4] IHI objects to the Court's consideration of extrinsic evidence regarding the circumstances under which the Construction Contract was created.  However, as discussed above, such evidence may be used to resolve an ambiguity in the Construction Contract.

16

related to the Construction Contract.  The parties transferred certain Purchase

Order work that was still outstanding to the Construction Contract, but that is quite

different from incorporating the entirety of the Purchase Orders into the

Construction Contract.  This transfer simply demonstrates that the parties

considered the agreements to stand on their own.

Further, IHI required Robinson to provide a letter of credit as security for

Purchase Order No. 1; IHI did not require security for Purchase Order No. 2; but

IHI required performance and surety bonds for the Construction Contract.  The

Performance Bond Robinson obtained from Fidelity to secure the Construction

Contract does not refer to the Purchase Orders at all and expressly states that

Fidelity is not liable for obligations unrelated to the Construction Contract.

In all, the foregoing facts provide evidence and support an inference that the

parties intended the three agreements to exist and operate independently and that

they did not expect the Purchase Orders to be incorporated wholesale into the

Construction Contract, as IHI argues.

Moreover, it would be unreasonable to interpret Section 30.3 as providing

indemnification for all of the work under the separate Purchase Orders, much less

for the performance of unknown entities and for any activities of any kind (whether

on or off the Project site).  That would lead to an absurd result.  The more

reasonable interpretation is that Section 30.3 applies to (i) the performance of work under the Construction Contract; and (ii) the performance of other activities or services in connection with Robinson's work under the Construction Contract.

The Court is not persuaded by IHI's argument that its interpretation of Section 30.3 makes sense when viewed in the context that "the line between the work required under the Purchase Orders [was] blurred with the work required under the [Construction Contract]." Robinson's completion of a part of its Purchase Order obligations at the Project site; the inclusion of certain Purchase Order work in the Construction Contract; and the reference in the Construction Contract to certain Purchase Order *tasks* do not equate to an incorporation of the entirety of the Purchase Orders, including all of the obligations under those agreements, into the Construction Contract. Indeed, if the Purchase Orders were intended to be incorporated into the Construction Contract, then it would have been unnecessary to execute a change order to delete work from the scope of a Purchase Order and insert that same work into the Construction Contract. Under IHI's interpretation of Section 30.3, the Purchase Order work would have already been included in the Construction Contract.

Additionally, IHI's focus on grammatical rules in interpreting Section 30.3 is misplaced. "The rules of grammatical construction usually govern, but to

effectuate the intention [of the parties], they may be disregarded."  O.C.G.A. § 13-2-2(6).  In accordance with this canon, "sentences and words may be transposed[] and conjunctions substituted for each other.  In extreme cases of ambiguity, . . . words may be supplied."  *Id*.  In short, rules of grammar cede to the parties' intent.  *See Morgan v. Richard Bowers & Co.*, 537, 634 S.E.2d 415, 418 (Ga. Ct. App. 2006) (noting that "[i]t has long been [the] practice [under Georgia law] to interpret contracts 'so as to give a reasonable, lawful and effective meaning to all manifestations of intention by the parties'" (citation omitted)); *Langley*, 834 S.E.2d at 805 (stating that "'[t]he context in which a contractual term appears *always* must be considered in determining the meaning of the term'" (citation omitted)).  And in any event, a determination that the parties intended to use serial versus Oxford commas in Section 30.3 does not resolve the ambiguity.  At best, it provides one possible interpretation of the disputed language.

Further, the record does not support IHI's assertion that Section 30.3 was drafted broadly to cover the Purchase Orders because at the time the parties executed the Construction Contract, the Project was impaired by Robinson's allegedly delinquent performance under the Purchase Orders, and IHI did not yet understand the full scope of that alleged deficiency.  If that were the case, one would expect the Purchase Orders to be explicitly included in the Construction

Contract and the Performance Bond.  They were not.  IHI did not even mention that the Purchase Orders were related to the Construction Contract during negotiations of the Construction Contract.

Viewing the Construction Contract as a whole and within the circumstances under which it was created, the Court concludes that the Purchase Orders and the Construction Contract were standalone contracts and that the parties did not intend to incorporate or otherwise merge the Purchase Orders into the Construction Contract.  As such, the Performance Bond does not incorporate or cover work Robinson undertook pursuant to the Purchase Orders.

### b.    Construing the Ambiguity Against the Drafter

"[I]f a contract is capable of being construed [in] two ways, it will be construed against the preparer and in favor of the non-preparer." *Hertz Equip. Rental Corp. v. Evans*, 397 S.E.2d 692, 694 (Ga. 1990) (finding that the trial court did not err in construing the ambiguity in the lease extension against the company that drafted it); *see also Winterboer v. Floyd Healthcare Mgmt., Inc.*, 778 S.E.2d 354, 359 (Ga. Ct. App. 2015) (stating that "when 'the construction of a contract is doubtful, the construction that goes most strongly against the drafter of the agreement is to be preferred'" (citation omitted)).  This does not, however, mean that "the non-drafter's interpretation automatically controls." *Langley v. MP*

20

*Spring Lake, LLC*, 834 S.E.2d 800, 804 (Ga. 2019).  The construction of the agreement against the drafter must still be "bound both by reasonableness and [the] goal of ascertaining the intention of the parties."  *Id*. at 805.

Here, the Court has already found that Fidelity's interpretation of the Construction Contract is reasonable and that it is consistent with the intention of the parties.  Construing the ambiguity in Section 30.3 "most strongly" against IHI, which drafted the agreement, thus means accepting Fidelity's interpretation of the provision.  Consequently, this rule of construction provides added support for the Court's conclusion here that Section 30.3 does not incorporate the Purchase Orders and was not meant to indemnify IHI for alleged damages arising out of the Purchase Orders.

### c.     Construing the Suretyship Obligation Narrowly

Under Georgia law, a surety's liability may "not be extended . . . by implication or interpretation.  The undertaking of a surety being *stricti-juris*, he cannot, in law or equity, be bound further than the very terms of his contract."  *Arnold v. Indcon, L.P.*, 813, 466 S.E.2d 684, 685 (Ga. Ct. App. 1996); *see also* O.C.G.A. § 10-7-3 ("The contract of suretyship is one of strict law; and the surety's liability will not be extended by implication or interpretation.").  In other

words, "the obligation of a surety is construed strictly in the surety's favor." *R. J. Griffin & Co. v. Cont'l Ins. Co.*, 497 S.E.2d 586, 587 (Ga. Ct. App. 1998).

Here, the language of the Performance Bond specifically provides that Fidelity is not liable for obligations "unrelated" to the Construction Contract. Neither Section 30.3 nor any other section of the Construction Contract refers to or incorporates the Purchase Orders. Therefore, an inference that the Purchase Orders were incorporated into the Construction Contract would extend Fidelity's liability on the Performance Bond beyond what it undertook to cover under the terms of the bond. Georgia law does not permit such an inference. To the contrary, the Court must construe the bounds of the Performance Bond strictly in favor of Fidelity. That construction requires a finding that Fidelity is liable only for damages arising out of the work undertaken pursuant to the Construction Contract, not the Purchase Orders.

### d. Construing the Performance Bond in Accordance With Industry Practice

"The general rule [regarding industry custom] is that valid usages concerning the subject matter of the contract of which the parties are chargeable with knowledge are by implication incorporated therein, if the contract is subject to the interpretation urged and if nothing within it excludes such interpretation as having been within the intention of the parties." *Gen. Forms, Inc. v. Cont'l Cas.*

*Co.*, 179 S.E.2d 522, 524 (Ga. Ct. App. 1970); *see also Puritan Mills, Inc. v. Pickering Construction Co.*, 262 S.E.2d 586, 588 (Ga. Ct. App. 1979) (accepting evidence regarding general construction and architectural practices to resolve a contract dispute); O.C.G.A. § 13-2-2(3) (stating that industry custom is binding if "it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract").

The record in this case reflects that in the construction industry, it is standard for performance bonds to have the same penal sum as the bonded contract price, and sureties expect and require the estimated cost of the bonded work to be no more than the price of the bonded contract (and the sum of the bond).  In accordance with that expectation, the sum of the Performance Bond in this case was set at the same price as the Construction Contract.  Robinson's president also testified that this structure was consistent with his thirty-four years of experience obtaining and providing surety bonds for construction contracts.[5]  Incorporating the Purchase Orders into the Performance Bond but keeping the bonded contract price at the price of the Construction Contract would have been contrary to

---

[5] The Court notes that the Performance Bond was issued on a standard form promulgated by the National Association of Surety Bond Producers, and the bond used form language from the American Institute of Architects.  This provides some indication that the transaction was handled according to industry custom.

industry practice.  As such, to the extent the aforementioned industry custom is of universal practice as to justify reliance on it here, it is further indication that the Performance Bond issued in the amount of Construction Contract price was expected to cover only work under the Construction Contract.

### III.  CONCLUSION

As discussed herein, the Court concludes that the Purchase Orders and the Construction Contract were standalone agreements and that the Purchase Orders were not incorporated into the Construction Contract.  For that reason, the Performance Bond does not incorporate or cover work undertaken pursuant to the Purchase Orders.  The Court therefore **GRANTS** Fidelity's Motion for Partial Summary Judgment, ECF No. 163, and **DENIES** IHI's Cross Motion for Summary Judgment, ECF No. 179.

In light of this ruling and its impact on the posture of the case, the Court finds that this is an appropriate time for the parties to mediate this dispute. Accordingly, the parties are **DIRECTED** to mediate the remaining claims in this matter before a neutral third party within sixty days of the date of this Order. Within seven days of the date of this Order, the parties shall inform the Court whether they elect to mediate their dispute before a Magistrate Judge of this division; if so, the Court will make the necessary referral.

Given the Order to mediate this dispute, the Clerk is **DIRECTED** to **ADMINISTRATIVELY CLOSE** the case for docket management purposes. Administrative closure will not prejudice the rights of the parties to this litigation in any manner nor preclude the filing of documents.

The parties must file a status report by the conclusion of the sixty-day mediation period stating whether mediation was successful.  If mediation was unsuccessful, IHI may file a motion to reopen the case no later than seven days after the end of the mediation period.  If IHI files a motion to reopen the case, the parties are **DIRECTED** to file a revised proposed scheduling order within twenty-one days of IHI's motion.  The proposed scheduling order should include deadlines for the outstanding tasks in this case, including discovery and any additional dispositive motions.

**SO ORDERED** this 30th day of September, 2022.

_____
**J. P. BOULEE**
United States District Judge